UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANGELO LOMANTO,

                                    Petitioner,

            -v-

ANTHONIA ADUKE AGBELUSI,

                                    Respondent.

22-CV-7349

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Before the court is Angelo Lomanto's petition for the return to Spain of the minor

children R.A.L. and S.M.L., his children with Respondent Anthonia Aduke Agbelusi.  Lomanto

brings this petition pursuant to the Hague Convention on the Civil Aspects of International Child

Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and the International Child

Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.*, ("Hague Convention" or "Convention").

Agbelusi, who traveled with the children from their prior residence in Marbella, Spain and

retained them in New York City, has asserted three defenses to prevent their return:  first, that

under Article 12 of the Hague Convention, the petition was filed more than a year after the date

of the wrongful retention and the children are now settled in the United States; second, that under

Article 13 of the Convention, R.A.L. has attained an age and degree of maturity such that the

Court may consider his objection to being returned; and third, that pursuant to Article 13 there is

a grave risk that ordering the return of the children to their father in Spain will expose them to

physical or psychological harm.

The Court concludes that Agbelusi has successfully proven that the children are now

settled, that the elder child is sufficiently mature and objects to return, and that the children

should not be separated.  Therefore, Lomanto's petition for their return is denied.

1

**FINDINGS OF FACT**

The Court held a six-day bench trial in this case, spanning from March 20, 2023 through March 28, 2023.  Because Agbelusi conceded for purposes of the Hague Convention that she had wrongfully retained the children in the United States, Lomanto was not required to make his *prima facie* case and accordingly, most of the trial focused on Agbelusi's three asserted defenses. During the trial, the Court heard from Lomanto and Agbelusi, witnesses in both New York and Marbella who testified about the children's environments and parental relationships in each respective place, and expert witnesses who testified about Agbelusi's allegations of abuse and the children's wishes, well-being, and maturity.  Finally, the Court met *in camera* with R.A.L. and S.M.L.  In making its findings of fact, the Court weighed the credibility of these witnesses and the parties, considered the evidence the parties submitted at trial, and considered the briefs submitted by the parties both before and after the trial.

1.      **Background and Early Years**

Agbelusi and Lomanto met in 2006 in Marbella, Spain.  She was twenty-two years old; he was thirty years old.  (Tr. 941:7-19; 1430:11-12; Ex. 116 at 6.)  Agbelusi was new to the city, having been born and raised in Lagos, Nigeria.  (Tr. 470:19-20.)  Lomanto was born in Italy and moved to Spain when he was around 18 years old.  He obtained legal residency in Spain.  (Tr. 941:7-16.)  The two fell in love and quickly moved in with each other, and at first, things between them were good.  (Tr. 470: 21-25; 471:4-9.)  On December 5, 2008, two years into their relationship, Agbelusi gave birth to R.A.L.  (470:15-16.)[1]

---

[1] Agbelusi obtained Spanish citizenship in 2020.  (Tr. 666:19-667:7.)  R.A.L. and S.M.L. are citizens of both Nigeria and Italy; they do not hold Spanish citizenship.  (Tr. 667:8-25.)

It was after R.A.L.'s birth when the couple began to experience difficulties.  When Lomanto met Agbelusi, Lomanto owned and worked at a gym in Marbella.  (Tr. 942:14-19.) After experiencing financial difficulty, however, Lomanto lost his ownership interest in the gym. He maintained his job as a personal trainer at its new incarnation, "Omega Gym," under the ownership of Sonia Guerrero.  (Tr. 942:18-943:2; Ex. T.)  Agbelusi believes these financial difficulties impacted their relationship.  (Tr. 474:5-16.)  Things between the two worsened until, from 2012 to 2014, the couple separated and Agbelusi moved out.  (Tr. 473:18-21; 474:17-23; 990:17-22.)  While separated, Agbelusi and Lomanto successfully shared custody of R.A.L.  (Tr. 475:3-8, 19-23; 990:18-25; 991:16-24.)

Agbelusi and Lomanto reconciled in 2014 and Agbelusi moved in with Lomanto, who at the time was sharing an apartment with his mother.  (Tr. 473:18-21; 474:17-23; 478: 1-24; 990:17-22.)  Agbelusi again became pregnant and gave birth to S.M.L. on September 27, 2016. (Tr. 470:17-18.)  Shortly after their reconciliation in 2014, relations had soured again and were particularly difficult after S.M.L.'s birth.  (Tr. 478:16-19; 480:15-23; 517:13-524:24; 528:15-18; 992:20-21; Ex. 116 at 5-6.)

**2.      July – August 2021: Travel to New York and Retention of the Children**

On June 26, 2021, Agbelusi left Spain with R.A.L. and S.M.L., then twelve and four, to visit her mother in New York City for the summer.  They first visited Cancun, Mexico, where they quarantined according to the current COVID-19 protocols.  Agbelusi and the children arrived in New York on July 12, 2021.  (Tr. 536:25-537:1; 539:14-23.)  Throughout this travel Agbelusi carried with her a written permission letter from Lomanto stating that he authorized her to take their children to Cancun and then to the United States.  This letter did not specify a return date.  (Tr. 538:12-20; 943:9-11; Exs. 1, 1A.)  Agbelusi had also obtained a visa for Lomanto to

join them on the trip to the United States for the summer, but Lomanto had declined and remained in Spain.  (Tr. 537:2-9; 543:7-12.)

Originally, the plan was for Agbelusi to return to Spain with the children at the end of August; though the date changed a few times, the final agreed-upon plan was for Agbelusi, R.A.L. and S.M.L. to return on August 28, 2021.  (Ex. DD.)  But on August 24, 2021, Agbelusi told R.A.L. that the three of them would not be returning to Spain as initially planned and would instead be staying in New York City, where Agbelusi had already enrolled the children in school. (Tr. 549:9-550:25.)  R.A.L., excited by the opportunities he saw for himself in New York City, texted Lomanto the same day and told him the same.  (Exs. 45; 45A at 37-39.)

Lomanto, however, did not agree that his children should remain in the United States. After R.A.L. told Lomanto the news, on August 24, 2021, Lomanto began leaving voice messages on Agbelusi's phone expressing his anger and confusion.  He stated: "United States, very cool there you will live a fucking awesome life.  Look I do not know.  He tells me that you both are going to stay there"; and "you took my children, they are in the other part of the world and they say they are not coming back here."  (Exs. 3A; 76A; 76B.)  Late on August 24, 2021 in New York, and thus early on August 25 in Spain,[2] Agbelusi herself told Lomanto over the phone that she planned to stay in New York with R.A.L. and S.M.L.  (Tr. 969:20-970:16; 972:4-13.)

---

[2] Lomanto argues that the time zone of this call is important because the fact that the day had switched in Spain, even if not in the US, means that he spoke to Agbelusi on August 25, not August 24.  This argument is unpersuasive.  First, as explained below, this still would not render the petition filed within one year.  And second, Lomanto's argument does not change the fixed point in time, just the unit.  This Court sits in the Eastern Time Zone, the children were retained in the Eastern Time Zone, and the instant petition was ultimately filed in the Eastern Time Zone. The Eastern Time Zone will henceforth be the unit used.

Lomanto acted swiftly upon hearing the news.  On August 25, 2021, he filed several

police reports in Marbella, Spain, reporting R.A.L. and S.M.L. missing.  (Exs. 2A; DD.)[3]  The

reports state that the two were "scheduled to return on August 28 of this current month, but

yesterday [Agbelusi] told him that she will return on September 7 but without the children, who

are going to stay in New York, having already enrolled them in school in that city.  The

complainant [Lomanto] shows to this police agent a photo of [Agbelusi's] flight itinerary for

September 7th."  (*Id.*)  The report also states that Lomanto "wants to put on record that he has not

given his consent for his children to stay there."  The report gives as the date of disappearance

August 24, 2021, "between 00:00(midnight)" and "00:001 hours," at "Piso, New York, United

States of America."  (*Id.*)

In his briefing and at trial, Lomanto argued that the Court should not rely on this

document as evidence that he knew the children had been unlawfully retained as of August 24,

2021, or at latest, August 25, 2021.  These arguments are unconvincing.  First, he contends that

the report was only what he "feared" was true, as it states that "[t]he complainant fears that what

his partner has said is true," and that he therefore did not *know* that the children would not be

returning on either August 24 or 25, 2021.  (*Id.*; *see* ECF No. 245 at ¶ 27.)  This argument is not

credible in light of the rest of the document, which clearly and unequivocally reports the children

missing as of August 24, 2021.  Lomanto also claimed at trial that he should not be held to these

reports, because he just "told a story" to the police, which they interpreted as a kidnapping.  (Tr.

_____

[3] Two such reports, numbered 19245/21 and 19235/21, were produced in discovery, and there may be a third report, as each of these reports states that it is an "extension of report 19186/21 of this Police Station, in which the complainant denounced the abduction of his two minor sons by his partner and the mother of the children, Anthonia Agbelusi Aduke."  (Ex. 21; DD.)  The earlier report was not produced, and Lomanto denied going to the police station more than once.  (Tr. 1096:17-1101:10.)

1101:23-1102:8.)  Yet Lomanto signed both reports after being informed of his "legal obligation to tell the truth," certifying them as accurately reflecting his current understanding.  (Exs. 2A; DD.)  Lomanto also attempts to argue that at the time, he thought that the children might be returning on September 7, 2021.  This is belied by the face of the report, which clearly states that as of August 25, 2023, Agbelusi had told him "yesterday," that is, August 24, 2021, that she would be returning on September 7 *without the children*, and that he showed the police her solo travel ticket as evidence.  (*Id.*)  Finally, even over a year later during this court proceeding, Lomanto provided a chronology to one of the expert witnesses in the case stating that on August 24, 2021, he "call[ed] the mother of my children to let her know that I don't like that plan [to stay in New York]."  (Ex. 73 at 1.)  This chronology also states that Agbelusi called him back on August 25, 2023, to tell him the news herself.  (*Id.*)  The Court finds that Lomanto knew on August 24, 2021 EST that Agbelusi did not intend to return his children to Spain, and that he did not consent to their non-return.

## 3.    Legal Proceedings in Spain and New York

Lomanto has never claimed to have retracted his police report, and indeed, proceeded with legal action in Spain.[4]  In the hope that Agbelusi would bring the children back to Spain of her own accord, however, he concealed this from her and continued to text and communicate with her kindly and intimately, because he believed "it would be the easiest way to get [his] children back, to make the report in Spain and to have the trial be in Spain."  (Tr. 1109:19-21.)  This included engaging with messages from Agbelusi regarding putting the children in school in New York and appearing to make plans to have them visit him in Spain the following summer.

---

[4] During the pendency of this action, Lomanto also filed a custody application in Spain. (Tr. 1175:9-13.)

(Tr. 561:17-564:8; Exs. K; 84A; 7A at 3.)  Lomanto testified that, despite these messages, he never intended to allow the children to remain in New York.  (Tr. 1107:1-2 ("I never gave permission for the children to come stay live — to live here.  Never."))  Rather, he felt that "ever since" he had reported his children missing through when Agbelusi came to Spain in September, he "was not free" to say what he wanted and "couldn't act the way [he] would have wanted" because he was "afraid that [he] would lose all contact with [his children]."  (Tr. 1105:12-16.)

Agbelusi arrived back in Marbella, Spain on September 13, 2021, without the children. Immigration officials stopped her at the airport.  (Tr. 559:6-20; 560:22-561:14.)  This was the first time since his initial messages on August 24 and 25 that she learned that Lomanto did not agree to her plan to live in New York with the children, and the first time she learned of the legal proceedings in Spain.  (*Id.*)

At this point, the tenor of the communications between Agbelusi and Lomanto changed abruptly.  Lomanto conveyed for the first time that, as she had cut off his contact with his children in violation of his rights as a father, he would "go for the children, for the custody of the children" and "take everything from [her]."  (Ex. 102A.)  He also lashed out at Agbelusi, telling her that she was "deplorable" and "dumb," that she had "a very small head," and that he was ashamed of having spent "15 years with a person with such a poor head as [hers]."  (Exs. 101A; 106A; 108A; 110A; 112A.)  Agbelusi pleaded with Lomanto to speak with her outside the context of the court proceedings, apparently still hoping for a reconciliation.  (Tr. 796:21-797:3; 1346:1-23; Ex. VVV.)  Agbelusi participated in the court proceedings and was represented by counsel.  She argued during these proceedings that the children's economic prospects and opportunities would be much better in New York.  (Ex. Q.)  She did not levy allegations of abuse against Lomanto in these proceedings.  (*Id.*)

The Spanish court issued an order on September 29, 2021, concluding that the habitual residence of the children was Spain and that Lomanto did not consent to the children's staying in New York.  The court ordered Agbelusi to return them to their habitual residence of Spain on pain of a financial penalty of 50 euros per day if she did not comply.  (Ex. BB at 7.)

Agbelusi returned to New York via Jamaica, again because of COVID-19 protocols.  At first, she intended to comply with the Spanish court order and send R.A.L. and S.M.L. back to Spain.  (Tr. 887:14-888:8.)  Agbelusi texted Lomanto on October 1 to tell him she was "organizing" R.A.L. and S.M.L.'s return.   Agbelusi's mother and sister and R.A.L. also discussed R.A.L.'s imminent return to Spain with Lomanto.  (Exs. G; L; 111A.)

Instead of returning R.A.L. and S.M.L. to Spain, however, Agbelusi cut off all contact between R.A.L. and S.M.L. and their father in mid-October.  She filed an appeal with the Spanish court, which was unsuccessful.  Writing during that appeals process in April 2022, Agbelusi stated that she was "currently abroad after having suffered mistreatment with threats made by [her] ex partner Angelo Lomanto" and that "fearing for [her] life and [her] children's life [she] left the house to save [herself] and [her] children and so that [they] would no longer suffer at Angelo Lomanto's hands."  (Ex. 11A.)

On August 26, 2022, Lomanto filed this action in the United States District Court for the Eastern District of New York.  (ECF No. 1.)  This initial filing was attorney error, as the petition stated that the children were located in the Bronx, which is in the Southern District of New York.  Accordingly, the Eastern District transferred this case to the Southern District on August 29, 2022.  (ECF No. 8.)  After another misstep that sent the case to the White Plains courthouse of the Southern District, it finally was reassigned to the undersigned in the Manhattan courthouse on August 30, 2022.

4.    **R.A.L. and S.M.L.**

a.  **General Living Conditions in New York and Spain**

In Spain, R.A.L. and S.M.L. resided in a two-bedroom, two-bathroom apartment with both of their parents.  (Ex. X.; Tr. 921:8-10.)  R.A.L. attended a local Catholic school, which one of Lomanto's witnesses, Antonio Rodriquez, testified was a "popular school" that "everyone in Marbella" wished to attend.  (Tr. 1419:1-1420:10.)  R.A.L.'s records from this school reflect that he was struggling academically: comments from his teachers state that he was "easily distracted," "[didn't] try hard enough," "does not pay attention to explanations," was "not studying at home," and was "a very restless child."  (Ex. 13A.)  His report cards recommended that he study with "a private teacher who is dedicated to him" because of his attention issues, and state that for several examinations, he was "not sufficiently prepared, leaving questions unanswered or answering them without a well-argued and studied explanation," and that he would likely be forced to re-take his first year of secondary school in part due to his poor performance in mathematics.  (Ex. 17A; *see also generally* Exs. 13A-17A; W at 1.)

At the beginning of R.A.L. and S.M.L.'s time in New York they resided in Agbelusi's mother's home in the Bronx, along with their grandmother, aunt, and cousin.  (Tr. 539:24-540:3.)  This initial living situation caused friction among Agbelusi, her mother, R.A.L., and S.M.L.  (Tr. 545:12-25; 606:8-16.)  When Agbelusi traveled to Spain and then Jamaica in September and October of 2021, R.A.L. and S.M.L. remained with their grandmother in the Bronx.  After Agbelusi returned, she cut off R.A.L. and S.M.L.'s contact with Lomanto, and he responded by repeatedly calling R.A.L.'s school, which "flagged" Lomanto and alerted Agbelusi.  (Tr. 604:16-605:15.)  Agbelusi, concerned by this contact and the fact that Lomanto knew her mother's address, as well as because of the strife in her mother's overcrowded home, moved to a domestic

violence shelter, also in the Bronx, where she, R.A.L., and S.M.L. share a private studio apartment.  (Tr. 610:2-20.)  The shelter provides social services and programming for children, such as a sleepaway camp R.A.L. participated in, and an afterschool program.  (Tr. 610:21-611-3.)  R.A.L. and S.M.L. continue to see their grandmother, aunt, and cousins, and have visited Agbelusi's brother and their other cousins in Maryland.  (Tr. 614:23-615:19; Exs. 34C; 34E; 34H; 34M; 34P; 34V; 34W; 36F.)

Initially, Agbelusi enrolled R.A.L. and S.M.L. in Cornerstone Academy Middle School and kindergarten, respectively.  (Tr. 555:4-16; 616:17-25; Exs. 4A-6A; 34U.)  Both children's school records reflect that they regularly attended school, and the evidence presented at trial indicates that the children quickly made friends.  (Tr. 617:4-14; Exs. 18; 25-27; 34H; 35K; 36U-V.)  Additionally, in contrast to his struggles in Spain, R.A.L. won an award for his performance in mathematics.  (Ex. 21.)

After graduating from middle school, R.A.L. enrolled in a new charter school, the Earl Monroe New Renaissance Basketball High School ("Earl Monroe"), which uses basketball as the foundation for its curriculum.  For example, in a math class, the examples given as part of the problem might reference basketball players.  (Tr. 88:10-89:5.)  At Earl Monroe, R.A.L. has received comments from his teachers that he "stays on task with little supervision" and "displays self-discipline."  (Ex. 31.)  He was named to the honor roll in the first quarter of the 2022-2023 year, and the Dean of Earl Monroe testified at trial that R.A.L. has "definitely come out of his shell," has "[n]ever" been the source of any issues, and has formed close connections with his teachers, particularly his homeroom teacher.  (Tr. 97:17-19; 98:5-12.)  R.A.L. also participates in out-of-school activities, such as basketball and a NASA engineering program.  (Tr. 630:2-631:4.)

In short, R.A.L.'s academic record in New York indicates a marked improvement in focus, discipline, and performance.

S.M.L. is also thriving in his new school.  S.M.L. graduated from kindergarten in June 2022, and enrolled in Success Academy Harlem 5 Elementary School, where he appears to be a popular student with many friends.  (Exs. 35I; 35J; 35L-N; 35P.)  S.M.L. also plays soccer.  (Ex. 75 at 7.)  Both children are now fluent in English.  R.A.L. is also fluent in Spanish, but S.M.L., who came to the United States from Spain at age four, prefers to communicate in English.  The Court does not find, however, that Agbelusi has done anything to deter S.M.L. from retaining his Spanish; in fact, R.A.L. and Agbelusi speak Spanish with S.M.L. at home so that S.M.L. can retain the language.

On Sundays, R.A.L. and S.M.L. attend church with Ms. Agbelusi at Sunrise Spiritual Church in Brooklyn, which they have attended for a year and a half.  (Tr. 32:12-14; 62:21-63:13.)  After services, members of the church mingle and eat together, and the church community has organized several outings for its younger members that R.A.L. and S.M.L. have attended.  (Tr. 47:5-7; 63:14-64:6; 66:3-9; 633:1-635:4; Exs. 36V; 36W.)  Sakiru Odubiro, a leader in the church, testified that R.A.L. frequently participates in Bible study and has come to him to discuss school and church.  (Tr. 40:23-41:7; 42:10-12.)  R.A.L. and S.M.L. are also particularly close with another church member and her family, Anuowapo Adebayo-Olojo. (147:3-6; 149:14-19).  Adebayo-Olojo's two daughters are thirteen and eleven, and Adebayo-Olojo testified that her children frequently chat with R.A.L. and S.M.L. via WhatsApp, where they make social plans and discuss church events.  (156:18-157:10.)

R.A.L. and S.M.L. do not currently have legal status in the United States.  Agbelusi is in the process of applying for legal status through her United States citizen husband, Kaymal

Dickerson, whom she married in October 2022.  (Tr. 668:21-669:1.)  Dickerson has limited

interactions with R.A.L. and S.M.L., does not live with them, and has met R.A.L. only once.

(Tr. 614:4-13.)  He has not met S.M.L.  (*Id.*)  After traveling to New York, Agbelusi initially

worked as a home health aide, and now works as a self-employed cleaner.  (Tr. 543:13-544:6;

665:16-666:4.)

     **b.   Dr. Fernandez's Report and *In Camera* Interview**

     R.A.L. and S.M.L. were both evaluated by Dr. Edward Fernandez, a licensed clinical

psychologist.  Dr. Fernandez performed this work *pro bono* and completed it on a remarkably

short deadline given the expediency of proceedings in this action.  As part of his report, he met

with R.A.L. and S.M.L., received evidence from the parties, and observed their interactions with

both Agbelusi and Lomanto.  (Ex. 75.)  Given the expediency, however, he was not able to

review all the evidence and submissions in this action prior to forming his opinions.

     Dr. Fernandez's assessment, after meeting with R.A.L. and S.M.L., is that R.A.L. is of

"sufficient age and maturity to have his opinion considered in the case," that he displays

"psychological maturity and attunement to his current circumstances," and that he "is capable of

making logical decisions."  (Ex. 75 at 12.)  S.M.L., while of "sufficient age-related maturity," is,

by contrast, at an age where he is highly influenced by his surroundings rather than forming his

own opinions.  Dr. Fernandez also observed the close relationship between the two children and

noted R.A.L.'s maturity and responsibility when it came to caring for his younger brother.  (*See*

Ex. 75 at 12 (R.A.L. "was always aware of where [S.M.L.] was, assisting with redirecting,

expressed a close bond with him and feeling that he must care for him."))

     The Court also met with both R.A.L. and S.M.L. *in camera*, accompanied by their court-

appointed attorneys.  To allow R.A.L. and S.M.L. to speak freely, the Court conducted this

interview without Agbelusi, Lomanto, or their counsel present, and the transcript is sealed.  The Court met first with R.A.L. and S.M.L. together, and then with each separately.  Snacks, coloring books, and toy cars to play with were provided.  Both parties submitted proposed questions for the interview.

S.M.L., age six, was rambunctious, energetic, and guileless.  His comments were overwhelmingly positive toward everyone — including his teachers, father, mother, brother, grandmother, and the Court.  Given his age and attention span, the interview with S.M.L. was relatively brief.

The conversation with R.A.L., age fourteen, lasted about an hour.  The Court found R.A.L. to be mature, intelligent, thoughtful, engaging, and reasonable.  He expressed himself clearly, honestly, and with impressive nuance and grace toward both of his parents.  Based on this conversation and the conclusions of Dr. Fernandez, the Court finds that R.A.L. is sufficiently mature and independent to justify crediting R.A.L.'s views in this case.

During the conversation with R.A.L., R.A.L. expressed his objection to returning to Spain and his strong desire to stay in New York.  In particular, he expressed a strong objection to being parted from his mother and his life, friends, and school in New York, despite acknowledging that he missed some creature comforts like his video game set-up in Spain.  R.A.L. also expressed that he does not wish to be permanently parted from either parent.

R.A.L. is very patient and conscientious with his younger brother.  The two are very close, and due to their affect during the interview with both children, as well as the evidence at trial, the Court finds it would cause significant damage to separate the two children.

5.     **Allegations of Abuse**

Both parties in this action have accused each other of providing an unsafe home for their children.

### a.  Agbelusi's Allegations Against Lomanto

Agbelusi roots these accusations, which underpin her "grave risk" defense, in several discrete allegations.  First, she alleges that Lomanto abused her, emotionally, physically, and sexually.  Second, she alleges that Lomanto has associations with various unsavory characters in Marbella, that he uses steroids, that he sells steroids to his clients, and that he brought their children with him on trips to buy steroids.  And third, she alleges that Lomanto had an inappropriate relationship with their older child because he often took showers with R.A.L. and slept on a mattress in the living room with him on the weekend.  Lomanto denies these accusations.

The Court finds Agbelusi's allegations of intimate partner violence from Lomanto credible.  Agbelusi's allegations throughout this case have been detailed, consistent, and unique.  (*See generally* Ex. 116 for a detailed account of her allegations.)  A qualified expert in intimate partner violence, Dr. Charles H. Heller, conducted a thorough examination of Agbelusi, concluding that her and Lomanto's relationship was significant for intimate partner violence and that Agbelusi exhibited symptoms of PTSD when relating the details about Lomanto's sexual and emotional abuse.  (Ex. 116 at 18; Tr. 1189:17-21.)  Heller also testified that Agbelusi's responses and demeanor throughout his examination of her were not consistent with malingering, and that he found her testimony credible.  (Tr. 1258:5-1260-5.)  Additionally, Agbelusi's allegations correspond with some of the statements R.A.L made to Dr. Fernandez, as well as some of Lomanto's testimony — though Lomanto did not characterize their interactions as

abuse.  (*See* Tr. 227:9; Ex. 62 (Dr. Fernandez recording that R.A.L. told him that Lomanto would "yell[]" and "hit the wall"); Tr. 992:20-25 (Lomanto acknowledging that he might "scream" and "yell" during difficult times); Tr. 1136:20-22 (Lomanto saying he understood that Agbelusi "enjoyed" herself during certain forms of sexual activity).)

Agbelusi also testified that Lomanto's verbal abuse would sometimes center on her race, and that he would call her a "foolish black" with a "very small head" whose African heritage made her inferior.  (Tr. 518:1-14.)  These allegations are particularly troubling with regard to the risk of psychological harm to the children, because R.A.L. and S.M.L. both share that African heritage.  And messages between Agbelusi and Lomanto suggest that one reason Lomanto objected to the children's schools in New York City was because they are "where the black people are" and "Latinos are."  (Ex. 8A at 2.)[5]

As Agbelusi has been consistent in her abuse allegations, so too has Lomanto been consistent in his argument that she ought not be believed.  Lomanto argues that Agbelusi is not credible because (1) she did not levy these accusations in the original court proceeding in Spain, (2) she initially pleaded with Lomanto to join her and their children in New York, and (3) while in Spain in September 2021, she sought to see Lomanto alone.  In some respects these arguments rest on assumptions that sound in harmful stereotypes and misconceptions about intimate partner violence.  (*See* Tr. 1193-1195; 1251; 1260-1261.)  They also do not overcome Agbelusi's

---

[5] Because of gaps in discovery on the part of Lomanto, the Court is in receipt of only Agbelusi's *responses* to Lomanto's alleged racist concerns.  Lomanto denies raising these concerns, which is difficult to square with messages responding to them.  In an ordinary case, Lomanto's failure to respond to discovery demands would be grounds for an adverse inference. But because of the import of this case, and its focus on R.A.L. and S.M.L., the Court declines to make such an inference.  The Court finds based on the admitted testimony and other evidence that Lomanto did make at least some race-based comments regarding Agbelusi and New York neighborhoods.  There is no compelling evidence, however, that Lomanto ever directed such comments at his children or made them in their presence.

testimony, the corroborating messages between her and Lomanto, and the force of Dr. Heller's expert report.

Agbelusi also argues that Lomanto poses a risk to their children because of his alleged use of steroids.  Lomanto is employed as a physical trainer and has the physique to match.  (*See e.g.* Exs. 41-43.)  Dr. Harrison G. Pope, an expert on anabolic-androgenic steroids, evaluated photographs of Lomanto and opined that he likely used steroids to achieve his physique.  (Ex. 115A at 9.)  Dr. Pope also opined that steroids may cause some users to become prone to violence and aggressive sexual behavior.  (Ex. 115A at 5-8.)  Dr. Pope's expert testimony, however, states that these effects occur in a "minority" of steroid users.  (*See, e.g.*, *id.* at 8.) Even assuming the truth of Dr. Pope's conclusion that Lomanto uses or has used steroids — which Lomanto denies — concluding that *Lomanto* is therefore aggressive or violent would require an inferential leap that is not warranted based on the evidence.  Nor has Lomanto been actually *examined* by a doctor for evidence steroid use.  The Court does not find that Lomanto has been aggressive or violent towards his children because of steroid use.

Agbelusi also alleges that Lomanto sold steroids as part of his work as a trainer, and that he therefore operated in the orbit of notorious individuals in Marbella and brought them into their children's lives.  (*See, e.g.*, Tr. 514:15-517:12.)  R.A.L. accompanied his father to the gym and to pick up items from another gym on occasion.  It is unclear, however, whether these were in fact illegal or dangerous substances or products.  Lomanto testified that he sometimes purchased injectable L-Carnitine, caffeine, and "artichoke powder" from the Nuevo Estilo gym in Fuengirola for sale to his clients.  (Tr. 1048:21-1049:11; 1050:17-1051:5; 1066:11-12.)  Three of Lomanto's witnesses—the owner of his gym, a client of his, and his sister—testified to the same.

Agbelusi submitted Spanish news reports lending some credence to her concerns about the environment at Nuevo Estilo.  The Nuevo Estilo gym was raided in 2017 by Spanish authorities, and its owner, Paco Mula, was arrested for distribution of "doping and anabolic substances."  (Ex. 51A.)  This arrest was apparently a large operation: Mula is the brother of the mayor of Fuengirola, and the Spanish authorities "intercepted more than three million doses of anabolic drugs," as well as 2.7 kilograms of cocaine in the raid.  (Ex. 54A at 1; see also Ex. 52A.)  While Lomanto and his witnesses denied knowledge of Mula's illicit operation, these claims are not credible in light of the news coverage submitted by Agbelusi.  (*Id.*; *see also* Tr. 1051:22-1052:6.)  But this evidence is at best circumstantial, and it does not reliably prove that *Lomanto* was involved in buying and selling illicit substances.

Finally, Agbelusi alleges that she suspected Lomanto of abusing their eldest son because he liked to shower with R.A.L., including when R.A.L. was twelve years of age.  R.A.L., however, denied any abuse on the part of his father, and he characterized the showers as a bonding time with his father.  Agbelusi also points to the fact that Lomanto would walk around in states of undress around the children, would sleep together with them on a mattress in the living room on the weekends after watching anime, and texted R.A.L. asking him to model new clothes for him.[6]

Both R.A.L. and S.M.L. were evaluated for signs of abuse by Dr. Fernandez.  Dr. Fernandez found no evidence of physical or sexual abuse on the part of Lomanto toward his children; he concluded based on his interviews and observation of Lomanto and his two children that Lomanto's relationship with R.A.L. and S.M.L. is "caring and loving."  (Ex. 75 at 13.)  It

---

[6] A recurrent difficulty in this matter has been Lomanto's failure to produce responsive material, failure to provide metadata, and selective editing and translating of the documents that were produced.  As a result, the Court has often been left with only parts of conversations.

also cannot be ignored that this matter is complicated by the many cultures involved, which likely have differing mores and attitudes toward nudity.[7]  Agbelusi's concerns do not overcome the force of Dr. Fernandez's evaluation and report and this Court's evaluation of all the testimony.  The Court does not find it likely that Lomanto abused R.A.L. or S.M.L.

### b.  Lomanto's Allegations Against Agbelusi

Lomanto also has alleged that Agbelusi abused their children both physically through corporal punishment and by manipulating them against him.  He contends that this shows that the children cannot be "settled" in New York under Agbelusi's care.

The most serious of these allegations pertains to an alleged incident in October 2021, shortly after Agbelusi returned from Spain and early into her and R.A.L.'s time in New York.  At that time, R.A.L. called his father and alleged that his mother had "choked him" and left him with "bruises on [his] face" and "blood behind [his] ear."  (Ex. C at 1.)

Both Agbelusi and R.A.L. acknowledged that this incident happened and described it to the Court.  Agbelusi testified that around this time, R.A.L. had become unusually aggressive, that "[h]e was very rebellious.  Never been that way.  He was like a monster that day.  I've never seen my child like that . . . he was somebody else."  (Tr. 775:1-6.)  Agbelusi described the incident as a "fight between a mother and a son who was rebelling," not "discipline."  (Tr. 776:13-14.)  Agbelusi denied choking R.A.L. or causing him to bleed but acknowledged that he was bruised by the altercation. (*Id*.)

R.A.L., in his conversation with the Court, independently stated that he had gotten in a physical fight with his mother in October that left him bruised but denied that he was bleeding or

---

[7] Agbelusi is Nigerian, Lomanto is Italian, the children were raised in Spain, and this Court sits in the United States.

short of air during the fight.  R.A.L. also described the time around September and October

2021, when he was living with his grandmother and while Agbelusi was embroiled in the first

legal proceedings in Spain, as a time when he was unusually and intentionally ill-behaved.

R.A.L. also told Dr. Fernandez that he was at the time speaking with his father for up to two

hours a day, and that Lomanto would "go inside [R.A.L.'s] head and make me mad."  (Ex. 61 at

1.)  R.A.L. also told Dr. Fernandez that he did not like living with his grandmother and his

mother's family, who were "African and very strict."  (Ex. 75 at 6.)  Speaking with the Court

months later, R.A.L. characterized his mother's reaction to his behavior during the fight as

reasonable, and an isolated incident.[8]   He stated that since then, his mother had not hit him.

Speaking with Dr. Fernandez and separately with the Court, R.A.L. denied receiving any

corporal punishment while in New York.  Rather, he said that Agbelusi would take away his iPad

or other electronics when he or S.M.L. misbehaved.  Based on the record in Court and

assessments of credibility, the Court does not find that Agbelusi poses a threat or risk of harm to

S.M.L. or R.A.L.

Lomanto has also alleged "parental alienation," that is, that Agbelusi has influenced

R.A.L. and S.M.L. against him such that they cannot be believed.[9]  As discussed above, the

Court met with both children.  This meeting occurred at the end of the trial, while Lomanto was

---

[8] The Court acknowledges that R.A.L. has been living with his mother in the time since, which Lomanto contends means that he may have been unduly swayed to forgive her or take her side.  After assessing R.A.L.'s credibility and the other evidence and testimony in this case, the Court does not find that to be the case, and credits R.A.L.'s characterization of the incident.

[9] There is also evidence of Lomanto attempting to influence the children against their mother.  Dr. Fernandez's notes indicate, for example, that during the pendency of this action, when Lomanto had mandated Zoom visits with R.A.L. and S.M.L., R.A.L. reported that his father would try to influence them against Agbelusi, while Agbelusi "reinforces that she doesn't want them to 'hate [their] father'" because "the problem [Lomanto has] is with her and not with [R.A.L. or S.M.L.]."  (Ex. 63 at 1.)

present in New York and after the children had spent a significant amount of time with their

father without their mother present.  The Court found neither child biased against their father; in

fact, both spoke positively about his visit and expressed a desire to continue their relationship

with their father.  R.A.L. in particular presented as mature and intelligent and as expressing his

own independent and unbiased opinions, not parroting those of his mother.

Ultimately, after weighing the evidence and assessing the parties' and other witnesses'

credibility, the Court finds that neither parent has shown that the other poses a risk of harm to

their children.

## CONCLUSIONS OF LAW

The Hague Convention, implemented by Congress in the International Child Abduction

Remedies Act ("ICARA"), Pub. L. No. 100-300, 102 Stat. 437 (1988) (codified as amended at

22 U.S.C. §§ 9001-9011), was adopted "in response to the problem of international child

abductions during domestic disputes."  *Abbott v. Abbott*, 560 U.S. 1, 8 (2010).  Its stated aims are

"to secure the prompt return of children wrongfully removed or retained in any Contracting

State" and "to ensure that rights of custody and access under the law of one Contracting State are

effectively respected in the other Contracting States."  Hague Convention, Art. 1.  Accordingly,

the Convention's "central operating feature is the return of the child."  *Lozano v. Alvarez*, 572

U.S. 1, 5 (2014).  This remedy "is designed to preserve the status quo in the child's country of

habitual residence and deter parents from crossing international boundaries in search of a more

sympathetic court," *Souratgar v. Lee*, 720 F.3d 96, 101 (2d. Cir. 2013), and serve the "core

premise" of the Convention that "the interests of children . . . in matters relating to their custody

are best served when custody decisions are made in the child's country of 'habitual residence.'"

*Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (quoting Convention Preamble at 7).  Though

the Convention embodies a presumption that unlawfully removed or retained children should be returned to their habitual residence, the Supreme Court has recently cautioned that "the Convention does not pursue return exclusively or at all costs," and that courts ought not order return without considering "the Convention's other objectives and requirements," such as its aim to "protect the interests of children and their parents." *Golan v. Saada,* 142 S. Ct. 1880, 1893 (2022) (quoting *Lozano*, 572 U.S. 1 at 19).

Ordinarily, the party petitioning for the child's return bears the burden of establishing a prima facie case that the child was wrongfully removed or retained. § 9003(e)(1). Here, Agbelusi concedes Lomanto's prima facie case, and therefore this case concerns only the three defenses to the presumption in favor of return under the Convention. Agbelusi bears the burden of establishing these defenses. § 9003(e)(2). Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be "promptly returned" to the child's country of habitual residence. § 9001(a)(4).

## 1.    The "Now-Settled" Defense

Article 12 of the Convention states that when a child has been wrongfully removed or retained, and at the date of the commencement of the proceedings before the authority of the "Contracting State" where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the child must be returned "forthwith." Thus, where the action is commenced "less than a year" from the date of the wrongful removal, no defense that the child is "settled" is available.

"[W]here the proceedings have been commenced after the expiration of the period of one year referred to in the previous paragraph," however, courts have the discretion not to order the return of the child if "it is demonstrated that the child is now settled in its new environment."

This provision thus "allows—but does not require—a judicial or administrative authority to refuse to order the repatriation of a child on the sole ground that the child is settled in its new environment, if more than one year has elapsed between the abduction and the petition for return." *Lozano v. Alvarez,* 697 F.3d 41, 51 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014).

The now-settled defense reflects a careful balance. Though "the Convention reflects a design to discourage child abduction . . . [,] the Convention does not pursue that goal at any cost." *Lozano*, 572 U.S. at 16. Rather, the treaty's presumption in favor of return "embodies the judgment that in most instances, a child's welfare is best served by a prompt return to that country," not a belief that "children's interests should be ignored when regulating all the problems which concern them." *Lozano*, 687 F. 3d at 52-53 (quoting Elisa Pérez–Vera, *Explanatory Report,* in 3 Conférence de la Haye de droit international privé, Actes et Documents de la Quatorzième session, Enlèvement d'enfants 426 (1982) ("Pérez–Vera Report")). The now-settled defense therefore embodies the Convention framers' recognition that "there could come a point at which a child would become so settled in a new environment that repatriation might not be in its best interest." *Blondin v. Dubois*, 238 F.3d 153, 164 (2d Cir. 2001), *abrogated by Golan v. Saada*, 142 S. Ct. 1880 (2022).

As with the other defenses provided in the Convention, the now-settled defense is a "narrow" exception to the rule that children who have been wrongfully retained must be promptly returned. 42 U.S.C. § 11601(a)(4). Respondent bears the burden of the establishing the now-settled defense by the preponderance of the evidence. *Id.* § 11603(e)(2)(B).

### a.  The One-Year Time Period

The now-settled defense is available only when the proceedings were commenced more than a year after the date of the wrongful removal or retention of the child.  The first question before the Court is therefore what date triggered this clock.

Lomanto initially consented to the children traveling to the United States to visit Agbelusi's family and provided a letter authorizing the travel with no return date.  Accordingly, this is a case of wrongful retention, not removal.  "The fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence."  Pérez–Vera Report ¶ 108 (*see also Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005) (recognizing the Pérez–Vera Report as "an authoritative source for interpreting the Convention's provisions")); *Taveras v. Morales,* 22 F. Supp. 3d 219, 232 (S.D.N.Y. 2014), *aff'd sub nom. Taveras ex rel. L.A.H. v. Morales*, 604 F. App'x 55 (2d Cir. 2015) (adopting the Pérez–Vera Report definition).

As stated in the Court's findings above, R.A.L. informed his father on August 24, 2021, that he would be staying in New York and enrolling in school.  Agbelusi told Lomanto the same late on August 24, 2021, when she was in New York, which was early August 25, 2021 in Spain.  On August 25, 2021, Lomanto filed a police report in Spain stating that his children had been kidnapped "yesterday" and giving August 24, 2021 as the date of disappearance.  In this report, Lomanto placed "on record" that he did not consent for his children to "stay" in the United States.  Lomanto never withdrew this police report.  August 24, 2021 is the date on which on which Lomanto "refused to agree to an extension of the [children's] stay" in the United States," and therefore the date of wrongful retention.  *See Taveras*, 22 F. Supp. 3d 233 (laying out legal

principles and concluding that if the petitioner did not initially set a return date or consented to a stay of indefinite duration, "the retention becomes wrongful on the date the petitioner refused to agree to an extension of the child's stay"); *Marks on Behalf of SM v. Hochhauser,* 876 F.3d 416, 418 (2d Cir. 2017) (fixing the date of unlawful retention on the date on which the taking parent informed the petitioner that she and the children would not be returning).

Lomanto attempts to push back this date in several ways. His first argument is that he only "feared" the children had been kidnapped as of August 24, 2021. This argument is unpersuasive for reasons explained in the Court's findings above.

Lomanto's second argument is that because the children's original return date was set as August 28, 2021, this is the date "on which the [children] ought to have been returned" and thus the date of unlawful retention. Essentially, Lomanto's argument is that he acquiesced to the children's stay in the United States until August 28 and withdrew his consent only as of August 28, 2021.

In some cases, courts have indeed found that the date of retention is the date on which the children were expected to return, even where the petitioner had earlier told the parent that they did not acquiesce to a longer stay. In *Karkainen v. Kovalchuk*, for example, the Third Circuit confronted a case where the petitioner had emailed the respondent in mid-July demanding that the child return home on August 10, the date for which she had purchased a return flight for the child, insisting that retention beyond that date would "constitute kidnapping." 445 F.3d 290, 289-90 (3d. Cir. 2006). There, the Third Circuit fixed the date of unlawful retention as August 10, not mid-July.

The key difference between *Karkainen* and the situation here, however, is that in this case Lomanto reported the children kidnapped *as of August 24, 2021.* Thus, the reasonable

interpretation of the events is that Lomanto initially consented to the children's visit to the United States but withdrew his consent on August 24, 2021, and thereafter understood them to be wrongfully retained.  This conclusion is supported by the case law.  In *Blackledge v. Blackledge*, for example, the Third Circuit explained that having initially acquiesced to a child's visit elsewhere, a parent could "accelerate" the retention date by withdrawing their consent, as "the retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." 866 F.3d 169, 179 (3d Cir. 2017).  By filing the police report and informing Agbelusi that he did not agree that the children should stay with her in New York, Lomanto clearly withdrew his consent.  *See also Hochhauser,* 876 F.3d at 422 (stating "retention" occurs on a fixed date, which in that case was when the respondent told the petitioner that "she would not be returning with the Children.").  It is also noteworthy that if Lomanto had truly acquiesced to his children remaining in the United States through August 28, 2021, then the police report he filed on the August 25, 2021 would have been false and unlawful.  *See Taveras*, 22 F. Supp. 32 at 236 fn. 18 (discounting the petitioner's reasoning as to retention date because petitioner's account placed the date after she had filed her initial request for return with the Spanish authorities).   And finally, the Court is persuaded by the reasoning in *Kosewski v. Michalowska*, 2015 WL 5999389 (E.D.N.Y. October 14, 2015).  There, the court held that even if the petitioner had an "understanding" that the respondent would return with the child at a later date, the triggering date was nonetheless prior to the anticipated date of return because the petitioner's actions indicated that he lacked the "subjective intent" to acquiesce to the child's remaining in the United States,

as demonstrated in part by his filing of a police report against the respondent showing his "lack of consent to the child's presence in the United States." 2015 WL 5999389 at *20-21.

Lomanto's next argument is that the date of unlawful retention ought to be in October 2021 because from August 2021 through October 2021, Agbelusi was attempting to persuade Lomanto to join her and the children in New York, and even traveled to Spain in an attempt to convince him. Lomanto also points to the facts that following the Spanish court proceedings, Agbelusi told Lomanto that she would send the children back to Spain on October 1, 2021, and that on October 11, 2021, Agbelusi's sister told Lomanto that Agbelusi intended to send the children back to Spain as soon as she returned with their passports.

First, Agbelusi's subjective understanding of whether Lomanto acquiesced to the children remaining in the United States is irrelevant to this inquiry. "Acquiescence is a question of the actual subjective intention of the wronged parent, not of the outside world's perception of his intentions." *Kosewski*, 2015 WL 5999389, at *20. For this argument to succeed, Lomanto would have to show that he acquiesced to the children's presence in the United States until October 2021. Neither his contemporaneous actions nor his later testimony indicates that he ever acquiesced to his children remaining in the United States. During the disputed time, Lomanto maintained a legal action against Agbelusi in Spain. He testified at trial that he only pretended to cooperate with Agbelusi and to consider moving to New York in an effort to trick her into returning the children to Spain. And he unequivocally testified that he "never" agreed for the children to remain in the United States. Lomanto cannot plausibly argue acquiescence.

Nor is it significant that Lomanto may have believed that Agbelusi would return the children in October. "'Retention' is a singular and not a continuing act." *Marks on Behalf of SM v. Hochhauser,* 876 F.3d at 420; *see also Kosewski*, 2015 WL 5999389 at *20-21. The retention

of the children became unlawful when Lomanto withdrew his consent, and it remained unlawful even as Agbelusi promised to return them.  At most, this argument amounts to a request for equitable tolling, because Lomanto may have mistakenly believed that the children would be returning in October.  The Supreme Court has clearly held, however, that "the 1-year period in Article 12 of the Hague Convention is not subject to equitable tolling."  *Lozano v. Montoya Alvarez,* 572 U.S. at 18.  As explained in detail by the Second Circuit in a thorough examination of the text and history of the Hague Convention, "the one-year period in Article 12 was designed to allow courts to take into account a child's interest in remaining in the country to which she has been abducted after a certain amount of time has passed."  Therefore, while the one-year clock is "perhaps arbitrary," it is firmly fixed, and "allowing equitable tolling of the one-year period would undermine its purpose."  *Lozano v. Alvarez*, 697 F.3d at 54-55.

Lomanto also argues that, because he learned about the nonreturn of the children *from Agbelusi* (as opposed to from R.A.L.) on August 25, 2021, and filed the police report on that date, August 25 rather than August 24 is the relevant date.  This argument also fails.  First, the record is undisputed that Agbelusi informed Lomanto late on August 24 New York time, and it was on August 25 only if the Court were to adopt Spanish time.  As previously explained, the relevant time for this action is New York time.  Nor can the Court adopt Spanish time for some dates and New York time for others as suits a party's needs.  And finally, on August 25, 2021, Lomanto reported the children missing as of August 24, and said that Agbelusi had informed him "yesterday."

In any event, this action was filed on August 26, 2022.  Ultimately, whether the date of retention is August 24 or August 25 is legally irrelevant because either way this action was filed more than "a year" after the wrongful retention.  Lomanto, however, argues that August 26, 2022

is still "within one year" of August 25, 2021 by operation of Federal Rule of Civil Procedure

Rule 6.  Rule 6 is triggered when a statute "does not specify a method of computing time."

This argument is unpersuasive.  Article 12 of the Hague Convention states that the now-settled defense is unavailable when the petition is filed "within one year" of the triggering event, and is available when the petition is filed outside the time period of "within one year."  "The interpretation of a treaty, like the interpretation of a statute, begins with its text."  *Golan,* 142 S. Ct. at 1891 (2022).  Here, the two paragraphs of the Convention, read together, indicate how the one-year period is to be calculated.  Lomanto's reading would essentially rewrite Article 12 to state that the now-settled defense is unavailable when the petition is filed within "one year and a day" and available when filed at least a year and *two* days after the triggering event.  The Court may not rewrite the Convention in this way.  *See Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134–135 (1989) ("To alter, amend, or add to any treaty by inserting any clause, whether small or great, important or trivial, would be to make, and not to construe a treaty.") (cleaned up).

Finally, Agbelusi argues that this action was commenced on August 29, 2022, not August 26, 2022, as that was the date that the action was transferred to its proper jurisdiction.[10]  As the Court concludes that the action was filed outside the one-year period regardless of whether August 26 or August 29, 2022 is the date on which the action commenced, it need not address this argument.  The now-settled defense is available under the facts of this case as a matter of law.

---

[10] Agbelusi's reasoning is that "commencement of proceedings," as used in Article 12 of the Hague Convention, is defined as "filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."  22 U.S.C. § 9003(b).

### b. The Merits of the Now-Settled Defense

Having decided that the now-settled defense is available, the Court turns to the question whether it should exercise its discretion to refuse repatriation to Spain. Although the Hague Convention does not define the phrase "settled," the Second Circuit has explained that the term "should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." *Lozano v. Alvarez*, 697 F.3d at 56. Although courts "may consider any factor relevant to a child's connection to his living arrangement," the Second Circuit has explained that courts should "generally" consider:

> (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church or participates in other community or extracurricular school activities regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

*Id*. at 56–57.

*Age of the Children:* "Courts generally conclude that repatriation of an infant is less burdensome on the child than repatriating an older child, who is more likely to have memories of the United States and more ties to the country." *Taveras,* 22 F. Supp. 3d at 236. When they first arrived in the United States, R.A.L. was twelve years old and S.M.L. was four years old. Now, they are fourteen and six, respectively. The ages of both children support a finding that they are settled. *See In re Lozano*, 809 F. Supp. 2d at 232 (finding a five-year-old child "old enough to form attachments" and denying return because she was settled, and collecting cases analyzing children of similar ages); *Taveras,* 22 F. Supp. 3d at 236-37 (finding an eight-year-old child settled); *Gwiazdowski v. Gwiazdowski*, 2015 WL 1514436 at *4-*5 (E.D.N.Y. 2015) (finding eight- and ten-year old children "old enough to form meaningful attachments to their new environment").

*Stability of the Children's Residence:*  In considering the stability of the children's residence, courts consider the number of homes they have lived in, the permanence of their residence, and the strength of their community and family ties.  *See In re D.T.J.,* 956 F. Supp. 2d 523, 535 (S.D.N.Y. 2013).  Currently, R.A.L., S.M.L., and Agbelusi reside in a single-family apartment in a domestic violence shelter, which they moved to after initially residing with Agbelusi's mother.  Though a shelter may not be an ideal environment, the evidence in this case shows that the shelter where R.A.L. and S.M.L. resides is a stable environment that provides them and their mother with their own apartment, and also provides community and resources, such as the summer camp that R.A.L. attended.  R.A.L. also expressed that the move to the shelter from their grandmother's house was positive, and that they maintain ties with their maternal family.  S.M.L. also told the Court enthusiastically about his weekly Friday visit to his grandmother's home, which he described as one of his favorite activities.  Thus, while the children have moved residences while in New York, the move was not disruptive, they have since been in stable housing, and there is no evidence that they will be asked to leave the shelter in the foreseeable future.  In cases where courts found that this factor weighed against finding a child settled, the children were often subject to more disruptive and frequent moves.  *See In re Lozano,* 809 F. Supp. 2d at 233 (collecting cases.)  Thus, while this factor does not weigh strongly in finding the children settled, it does not preclude finding them settled either.

*Whether the Child Attends School or Day Care Consistently:*  R.A.L. and S.M.L. have consistent attendance records and appear to be thriving in school.  While they have switched schools once while in New York, because they had each graduated school levels (from middle to high school, and from kindergarten to first grade) and enrolled in charter schools, this move was not disruptive or out of the ordinary.

In Spain, R.A.L.'s grades reflected poor to mediocre performance, and he was at risk of being forced to repeat a grade because of performance, focus, and discipline issues. By contrast, R.A.L. spoke highly of his school and friends in the United States and has won academic honors. (*See* Exs. 4A-6A; 34U.) S.M.L. also won a perfect attendance award at his kindergarten. (*See* Ex. 25.) This factor strongly favors a finding that the two children are settled. *See Taveras*, 22 F. Supp. 3d 219 at 237 ("consistent attendance at school and academic improvement strongly favor a finding" that a child is settled); *D.T.J.* 956 F. Supp. 2d at 535, 539 (finding a child settled in part because the child was "academically on a strong upward trajectory.")

*Whether the Child Attends Church or Participates in Other Community or Extracurricular School Activities Regularly:* This factor also strongly favors finding that the children are settled. R.A.L. and S.M.L. have regularly attended the same church with Agbelusi for a year and half, and frequently participate in church social and educational events. R.A.L. also participates in extracurricular basketball and a weekend educational program organized by NASA, while S.M.L. plays soccer.

*The Respondent's Employment and Financial Stability:* Agbelusi is currently employed as a household cleaner. Although her financial income is limited, the record indicates that she has been consistently employed while in New York and is hardworking and resourceful. She also has available support from her mother, sister, and brother. R.A.L.'s and S.M.L.'s basic needs are being met, though with some public assistance in the form of their housing. *See Taveras*, 22 F. Supp. 3d at 238 (finding a child settled despite "limited" household income where the Respondent was a "hardworking individual" who had been "consistently employed.") This factor does not weigh strongly in favor of finding the children settled, but it does not preclude a finding that they are settled.

*Whether the Child has Friends and Relatives in the New Area:* This factor weighs strongly in favor of finding the children settled.  Both R.A.L. and S.M.L. have developed strong friendships and networks in New York through their school and church activities.  They both maintain friendships from the Cornerstone Academies and have strong social groups at their current schools.  R.A.L. also explained to the Court and to Dr. Fernandez that he feels closer to his friends in New York than to his friends in Spain.  (*See* Tr. 389:19-15 (Dr. Fernandez explaining that "peer social networks" are of prime importance in adolescence).)

The children also have strong family connections in the area.  Although neither R.A.L. nor Agbelusi appears to have enjoyed *living* with Agbelusi's mother, R.A.L. expressed that their relationship has improved now that they live separately, and S.M.L. in particular seems close to his maternal grandmother.  To be sure, just as R.A.L. and S.M.L. have strong maternal family connections in New York, they also had paternal family connections in Spain.  The question before the Court is not, however, whether they were settled before they were taken to New York, but rather whether they have built sufficient bonds in New York such that uprooting them *again* would be disruptive.  The robust social networks that both R.A.L. and S.M.L. have developed in New York strongly support a finding that they are now settled in their new environment.

*Immigration Status of the Child and the Respondent*: The Second Circuit is clear that lack of legal immigration status does not preclude a finding that children are settled.  *Lozano v. Alvarez*, 697 F.3d at 57.  In considering immigration status, courts consider factors such as whether there is an imminent threat of deportation, likelihood that the child will be able to acquire legal status, the child's age, and the likelihood that they will be harmed by inability to receive government benefits.  *Id.*  Here, there is no indication that Agbelusi, R.A.L., or S.M.L. are at risk of imminent deportation, and the record demonstrates that Agbelusi is taking proactive

steps to obtain legal status for herself, and that she intends to apply for legal status for R.A.L. and S.M.L. following the conclusion of this action.  Nor is there any indication that lack of legal status has impaired R.A.L.'s or S.M.L.'s ability to obtain government benefits; indeed, both are enrolled in public school, R.A.L. is participating in a program sponsored by NASA, and the family resides in government housing.  This factor does not weigh in favor of finding R.A.L. and S.M.L. settled, but it does not preclude finding them settled.

In summary, the Court is not persuaded that it is precluded from finding that R.A.L. and S.M.L. are settled, as Lomanto argues it should, because of their residence in government housing, their immigration status, or Agbelusi's relatively limited income.  A "child's life does not have to be perfect for [him or her] to be settled."  *In re Lozano*, 809 F. Supp. 2d at 233.  The Court is also not persuaded by Lomanto's allegations that R.A.L. and S.M.L. have been abused by their maternal family, which R.A.L., S.M.L., and the witnesses all credibly deny and which Lomanto has not proved by a preponderance of the evidence.  By contrast, Agbelusi has demonstrated by a preponderance of the evidence several factors weigh strongly in favor of finding R.A.L. and S.M.L. settled, including their ages, academic performance and improvement, extracurricular activities, peer social relationships, and family relationships.  In light of the strength of her showing on these factors, the Court concludes that R.A.L. and S.M.L. are settled such that repatriating them "would be disruptive with likely harmful effects."  *In re Lozano*, 809 F. Supp. 2d at 230.

## 2.    The "Mature Child" Defense

Article 13 of the Hague Convention also permits a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of

maturity at which it is appropriate to take account of its views."  Hague Convention, Art. 13.

According to the Explanatory Report, under this provision a child's objection may be conclusive:

> [T]he Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account…the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will.

Pérez–Vera Report ¶ 30; *see also Blondin v. Dubois*, 238 F. 3d at 166.

Based on its own interview with R.A.L. and S.M.L., and the expert evaluation of Dr. Fernandez, the Court finds that R.A.L. is of sufficient age and maturity to take account of his views.  S.M.L., by contrast, is not of sufficient age and maturity to qualify for this defense. However, the Court concludes that separation of R.A.L. and S.M.L. would cause significant hardship and psychological harm, and ought to be avoided at all costs.  "Courts in this Circuit have frequently declined to separate siblings, finding that the sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention."  *Ermini v. Vittori*, No. 12 Civ. 6100, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013), *aff'd as amended,* 758 F.3d 153 (2d Cir. 2014).

R.A.L. objects to being returned to Spain.  His articulation of his reasoning was rational, logical, and clear.  The Court is also persuaded that his objection was the product of his own considered and independent thinking, rather than a product of "undue influence" by his mother, as Lomanto argues. This defense independently justifies denial of the Petition.

The Court finds by a preponderance of the evidence that R.A.L. and S.M.L. are settled in the United States, and that R.A.L. is of sufficient age and maturity that the Court may consider his objection to return.[11]

### 3.      Whether Return is Nonetheless Appropriate

Despite these affirmative defenses, it would be within the Court's discretion to order repatriation notwithstanding.  Here, Petitioner missed the one-year cut off by mere days, and the Court cannot ignore that Agbelusi wrongfully retained the children in the United States, and for a period of months, unilaterally cut off their contact with their father and their paternal familial connections in Spain.  This was in clear violation of Lomanto's rights and potentially harmful to the children, as well as to their relationship with their father.  Nor is Lomanto unjustified in complaining that refusing to repatriate the children may, in effect, validate Agbelusi's unlawful action in retaining them in New York in the first instance.

These considerations, however, are not the end of the inquiry.  The Supreme Court and the Second Circuit have been clear that along with deterrence, the Hague Convention also holds at its center an interest in the welfare of the children and their interests in remaining settled. "The child's interest in choosing to remain, Art. 13, or in avoiding physical or psychological harm, Art. 13(b), may overcome the return remedy. The same is true of the child's interest in settlement." *Lozano v. Montoya Alvarez*, 572 U.S. 1 at 16.  This is such a case.  Lomanto's petition for the return of R.A.L. and S.M.L. is denied.[12]

---

[11] Although Agbelusi has also asserted the defense of grave risk of harm, having concluded that Lomanto's petition should be denied on two independent grounds, the Court need not consider this final affirmative defense.

[12] It bears stressing, however, that the Hague Convention is not intended to decide custody of the children, but rather to determine venue for the ultimate custody determination. *See Lozano v. Montoya Alvarez,* 572 U.S. at 5.  Nothing in this opinion should be construed to

## EVIDENTIARY RULINGS

As has been referenced in this opinion, the difficulty of this case was compounded by scattershot and contentious discovery. The Court has considered all of the parties' letters and submissions regarding which exhibits should be deemed admitted, and which should not.

Agbelusi has made particularized objections to many of Lomanto's exhibits based on incompleteness, improper translation, lack of foundation, failure to produce the exhibits prior to trial, and failure to produce metadata corroborating the origination of the exhibits. (*See* ECF Nos. 212; 221.) Were the Court to strictly apply the Federal Rules of Evidence, and particularly in light of deficiencies in his discovery production, Lomanto would have been able to present limited evidence in this case. Given the seriousness of this case, the Court errs on the side of inclusion. Accordingly, the Court notes these objections, but accepts Lomanto's exhibits according to their worth and persuasiveness.

The one exhibit the Court cannot admit, however, is petitioner's exhibit HHHH, which purports to be the full video of the first proceedings in Spanish court. Lomanto was repeatedly and specifically directed to produce this video during discovery, and yet failed to do so until the trial was near complete.

Lomanto objects to the admission of "any exhibit above number 75" from Agbelusi, contending that these exhibits were a "surprise" and therefore prejudicial. (ECF No. 226 at 3.) This objection is overruled. Lomanto admits that these exhibits were produced long before trial

---

reflect that the Court finds Lomanto unfit to be a father, or a judgment that he should lose contact with or be deprived of some form of custody over his children, whom he evidently loves and misses very much. It is also worth reiterating that both children love and miss their father. The ultimate custody determination is outside this Court's purview. In making this very difficult decision, the Court has considered only the applicable defenses of the Hague Convention and whether they have been proven by the applicable standard.

in productions on November 11, 2022, and January 11, 2023.  The real crux of Lomanto's

objection appears to be that these exhibits were produced originally in Spanish.  Courts have

repeatedly held, however, that there is no obligation for a producing party to translate documents

provided to the other party, and indeed, some courts have held that court orders mandating

translation exceed the authority of the district court.[13]  *See Nature's Plus Nordic A/S v. Nat.*

*Organics, Inc.,* 274 F.R.D. 437, 442 (E.D.N.Y. 2011) (collecting cases).  Nor is it persuasive that

some of these exhibits were not disclosed by the March 3, 2023 deadline to list exhibits for trial,

particularly because as of March 3, 2023, Lomanto had not disclosed any of the exhibits he

ultimately presented at trial.

---

[13] Nor is Lomanto's complaint about the volume of discovery produced persuasive.  The Court ordered the parties to turn over "all relevant documents in their possession."  ECF No. 31. Under the Federal Rules of Civil Procedure and the Rules of Evidence, relevance is construed "broadly" and thus, an order to compel "relevant documents" compels parties to disclose "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978). Agbelusi's production complied with the rules and the orders of the Court.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, Angelo Lomanto's

petition for the return of R.A.L. and S.M.L. under the Hague Convention is denied.

The Clerk of Court is directed to close all open motions and to close this case.[14]

SO ORDERED.

Dated: June 22, 2023
New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

[14] The Court wishes to thank the *pro bono* counsel and professionals for the vigor and skill with which they litigated this difficult case, and for their donation of substantial time and resources.  Their *pro bono* work on this case has been in the finest tradition of this District.  The Court specifically wishes to acknowledge the law firm of Davis, Polk & Wardwell, which represented the Respondent; the law firm of Simpson, Thacher and Bartlett and Professor Jennifer Baum, Esq., and the Child Advocacy Clinic at St. John's University Law School for their representation of the minor children R.A.L. and S.M.L.; and Dr. Edward Fernandez, who conducted psychological evaluations on a *pro bono* basis.